# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**EDWARD WOLVIN,**

**Plaintiff,**

**v.**                                                   **Case No. 21-CV-1328**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration,**

**Defendant.**

# DECISION AND ORDER

## 1. Introduction

Edward Wolvin is back before this court for a fourth time seeking disability insurance benefits and supplemental security income. *See Wolvin v. Astrue*, No. 08-CV-476, 2009 U.S. Dist. LEXIS 36771 (E.D. Wis. Apr. 28, 2009); *Wolvin v. Berryhill*, 16-cv-1228-LA (E.D. Wis.); *Wolvin v. Saul*, No. 18-CV-1285, 2019 U.S. Dist. LEXIS 171953 (E.D. Wis. Oct. 3, 2019). The Administration concluded that Wolvin was disabled as of October 20, 2013 (Tr. 1689), and so at issue here is the period between July 27, 2005, and October 19, 2013.

All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 10, 11), and the matter is ready for resolution.

## 2. ALJ's Decision

In determining whether a person is disabled, an ALJ applies a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). The ALJ found that Wolvin "did not engage in substantial gainful activity from July 27, 2005 through October 19, 2013[.]" (Tr. 1692.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). The ALJ concluded that Wolvin has the following severe impairment: "degenerative disc disease of the lumbar spine." (Tr. 1692.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (called "the listings"), 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-month durational requirement, 20 C.F.R. §§ 404.1509, 416.909, the claimant is disabled. 20

Case 2:21-cv-01328-WED   Filed 01/24/23   Page 2 of 27   Document 38

C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. 20 C.F.R. §§ 404.1520(e), 416.920(e). The ALJ found that Wolvin "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]" (Tr. 1695.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the most the claimant can do despite her impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a). In making the RFC finding the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). In other words, "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. The ALJ concluded that Wolvin has the RFC "to perform the full range of sedentary work." (Tr. 1696.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560, 416.920(a)(4)(iv), 416.960. The ALJ concluded that Wolvin was unable to perform his past relevant work. (Tr. 1709.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering his RFC, age, education,

and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c), 416.920(a)(4)(v), 416.960(c). At this step the ALJ concluded that Wolvin was not disabled under SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2. (Tr. 1709-10.)

### 3. Standard of Review

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). It is "more than a mere scintilla." *Id*. "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

4

## 4. Analysis

### 4.1. SSR 16-3p

Once an ALJ finds that a claimant "has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms," he must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities …." SSR 16-3p. The ALJ's assessment is entitled to special deference, and the court can upset it only if it was "patently wrong." *Apke v. Saul*, 817 F. App'x 252, 257 (7th Cir. 2020).

There is no dispute that Wolvin suffers from degenerative disc disease and that this impairment could cause significant pain and other symptoms. However, the ALJ concluded that Wolvin's statements regarding the "intensity, persistence and limiting effects" of his symptoms, in particular pain, "are not entirely consistent" with the record. (Tr. 1699.)

Courts, *see, e.g.*, *Minger v. Berryhill*, 307 F. Supp. 3d 865, 871 (N.D. Ill. 2018), including this court, *see, e.g.*, *Green v. Kijakazi*, No. 20-CV-969, 2021 U.S. Dist. LEXIS 142304, at *17 (E.D. Wis. July 29, 2021) (remanding because it was impossible to determine which of three articulated standards, including "not entirely consistent," the ALJ actually applied); *Whyte v. Saul*, No. 18-CV-1274, 2019 U.S. Dist. LEXIS 185830, at *17-18 (E.D. Wis. Oct. 25, 2019) (same), have criticized ALJs' use of "not entirely consistent" as suggesting

a more rigorous standard. The court, however, agrees with Magistrate Judge Nancy Joseph and her conclusion that the language reflects "meaningless boilerplate" that does not, by itself, support remand. *Warden v. Kijakazi*, No. 20-CV-1566, 2022 U.S. Dist. LEXIS 40371, at *20 (E.D. Wis. Mar. 8, 2022); *see also Fanta v. Saul*, 848 F. App'x 655, 659 (7th Cir. 2021). "Plaintiffs would do better to forgo challenging the boilerplate and instead focus on what the ALJ actually does in the decision." *Seibel v. Saul*, No. 19-CV-643, 2020 U.S. Dist. LEXIS 63029, at *20 (E.D. Wis. Apr. 8, 2020); *see also Pfitzer v. Saul*, No. 20-CV-49, 2020 U.S. Dist. LEXIS 194115, at *15 (E.D. Wis. Oct. 20, 2020) (noting that, despite using the "not entirely consistent" standard, the ALJ's decision reflects application of the proper standard); *Severson v. Saul*, No. 19-CV-463, 2020 U.S. Dist. LEXIS 41068, at *8 (E.D. Wis. Mar. 10, 2020) (same).

The ALJ repeatedly noted that Wolvin's medical providers frequently stated that he did not appear to be in "acute distress." (ECF No. 24 at 12-14.) As the court noted the last time it reviewed Wolvin's case, *Wolvin*, 2019 U.S. Dist. LEXIS 171953, at *6-7, there is no basis for concluding that a medical professional uses the term "no acute distress" differently than a lay person—*i.e.*, at that moment the patient did not exhibit outward signs of severe or intense pain. *Id*. The fact that Wolvin did not appear to be in acute distress during many of his medical appointments is relevant by itself. But what is most material is that medical professionals often noted that Wolvin did not appear to be in "acute distress" at times when Wolvin was subjectively reporting severe pain. This

juxtaposition is relevant to an assessment of the severity of Wolvin's symptoms under SSR 16-3p and supports an inference that he may be exaggerating his symptoms. Granted, exaggerating his symptoms was not the only inference; Wolvin may have simply been stoic in his expression of pain. But that the ALJ made one reasonable inference over another is not a basis for remand.

Nor was the ALJ's reliance on the fact that Wolvin was frequently observed to be in "no acute stress" undermined by the fact that medical providers sometimes did observe him in apparent distress. There is no dispute that Wolvin experienced pain, and that his pain varied. The ALJ did not suggest that Wolvin was capable of fulltime work because medical providers did not see him writhing in pain. The ALJ merely assessed the nature and extent of Wolvin's pain in accordance with SSR 16-3p and reasonably concluded that the evidence supported the conclusion that Wolvin's symptoms were not as severe as he alleged.

The record contains evidence that both supports and undermines Wolvin's claim of disability. For example, Wolvin was sometimes found lying on the floors of examination rooms (Tr. 1700, 1702), which he said was necessary to alleviate his severe pain. The ALJ, however, found more compelling the fact that Wolvin was then able to get up from the floor without any apparent difficulty or distress. (Tr. 1700.) Even the medical expert, whose opinion was largely supportive of Wolvin, found his lying on the floor of

examination rooms to be odd and stated that Wolvin may have been "showboating." (Tr. 1738-39.)

But the ALJ's assessment was not blindly one-sided. He credited certain evidence despite reasons to discount it. For example, Wolvin was prescribed significant doses of narcotics, which medications were repeatedly adjusted in an effort to bring him better relief. As the court acknowledged in its prior decision, "[t]he fact and extent of this treatment tends to corroborate Wolvin's claims of debilitating pain." *Wolvin*, 2019 U.S. Dist. LEXIS 171953, at *10. The medical expert opined that Wolvin's narcotic dosages were "highly inappropriate," "inordinate," and "egregiously incorrect" and raised a concern "of drug-seeking behavior and addiction." (Tr. 1708-09; 1739). The ALJ dismissed this aspect of the medical expert's opinion and accepted that Wolvin's medication and treatment history supported his subjective symptoms.

Neither the court's prior decision, nor SSR 16-3p, required the ALJ to accept Wolvin's subjective symptoms in light of his treatment and medication history; they were merely one factor the ALJ was required to consider. The ALJ reasonably considered Wolvin's narcotic use vis-à-vis his ability to engage in sedentary work. Wolvin's argument to the contrary relies in part on a misrepresentation of the vocational expert's testimony. Specifically, Wolvin says that "the vocational expert found that heavy narcotic use would pose a threat to worker safety and could not be accommodated. (R. 1768)." What the vocational expert actually said was that *if* the narcotic use posed a threat to the

worker's safety, it could not be accommodated. (Tr. 1768.) The use of prescribed narcotics is not inconsistent with the ability to engage in substantial gainful activity. *See Fowlkes v. Saul*, No. 19-CV-1648, 2021 U.S. Dist. LEXIS 7050, at *8-9 (E.D. Wis. Jan. 14, 2021) ("[P]rescription opiate use does not preclude all work. Such a holding would revolutionize the social security disability program given how commonly opiates are prescribed in the United States.").

The ALJ also appropriately considered Wolvin's activities of daily living. There was a time when ALJs routinely conflated limited activities of daily living with an ability to work fulltime, leading to frequent admonishments by courts. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (citing cases). The error is self-evident; a person who can wash his own dishes can't necessarily work fulltime as a dishwasher.

That error is now rare. Nonetheless, plaintiffs routinely allege that an ALJ errs whenever he relies on a claimant's activities of daily living to support an unfavorable decision. But consideration of a claimant's daily activities is obviously not error; an ALJ is required to consider a claimant's daily activities when assessing the severity of the claimant's symptoms. SSR 16-3p. Here, the ALJ not only appropriately considered Wolvin's activities of daily living in assessing his symptoms but explicitly acknowledged that Wolvin's activities did not equate to an ability to work (Tr. 1703).

Ultimately, most significant in the ALJ's assessment of Wolvin's symptoms were certain clinical findings, including his generally "normal gait, strength, muscle bulk and

tone, and movement in the examination room," which supported his conclusion that Wolvin's symptoms were not as severe as he alleged. (Tr. 1703; *see also* (Tr. 1699) (noting that Wolvin typically had "normal gait, strength, sensation, coordination and balance, normal bulk and tone, negative straight leg raise testing and intact ability to walk on heels and toes and do deep knee bends"). But, as Wolvin notes, sometimes medical professionals noted abnormalities in these domains, and there were other objective factors supporting Wolvin's reported symptoms.

It is commonly true, especially in cases like Wolvin's, where symptoms are expected to vary day-to-day, for evidence to point both ways. Sorting through those conflicts is the job of the ALJ. Wolvin naturally emphasizes the favorable facts to argue that the ALJ erred; the ALJ naturally emphasized other facts to support his conclusion. Wolvin has demonstrated, at best, that the ALJ could have concluded that his subjective symptoms were supported by the record. But he has not demonstrated that the ALJ was required to so find, or that the ALJ erred in reaching the opposite conclusion. Accordingly, the court must reject Wolvin's argument that the ALJ erred in assessing his symptoms.

## 4.2. Opinions

The record contains many medical opinions. The ALJ discussed the opinions of State Agency medical consultants Michael Baumblatt, M.D., Zhen Lu, M.D.,[1] and Pat Chan, M.D., testifying medical expert Arthur Lorber, M.D., consulting source neurologist Julian Freeman, M.D., and treating sources orthopedic surgeon W. Keith Kahle, M.D., neurosurgeon Todd Trier, M.D., and physical medicine and rehabilitation provider Courtney Hogendorn, M.D.

"[M]ore weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). "An ALJ must offer good reasons for discounting the opinion of a treating physician." *Israel v. Colvin*, 840 F.3d 432, 437 (7th Cir. 2016). "A contradictory opinion of a non-examining physician does not, by itself, suffice as a justification for discounting the opinion of the treating physician." *Id.* (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's

---

[1] The ALJ refers to Zhen Lu, M.D, who initially assessed Wolvin's claim. (Tr. 24.) However, the ALJ did not provide any citation to an opinion by Lu, nor substantively discuss any such opinion. The parties do not discuss Lu.

opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.").

However, "internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion," provided the ALJ adequately articulates his reasoning for discounting the opinion. *Clifford*, 227 F.3d at 871. Additionally, a treating physician whose opinion merely parrots the claimant's subjective complaints may be entitled to lesser weight. *See Givens v. Colvin*, 551 F. App'x 855, 861 (7th Cir. 2013); *Frankovis-Miesfeld v. Saul*, No. 19-CV-1842, 2021 U.S. Dist. LEXIS 14064, at *16-17 (E.D. Wis. Jan. 26, 2021) (citing *Jozefyk v. Saul*, No. 19-CV-1606, 2020 U.S. Dist. LEXIS 183703, at *15 (E.D. Wis. Oct. 2, 2020)); *see also Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018) ("An ALJ can give less than controlling weight to medical opinions based on subjective reports and can even reject a doctor's opinion entirely if it appears based on a claimant's exaggerated subjective allegations.").

"If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)), and assess the weight to give the opinion, *Elder*, 529 F.3d at 415.

The ALJ need only "minimally articulate" his reasons for the weight he gives a medical source's opinion. *Id*. This is a "very deferential standard" that has been characterized as "lax." *Id*. In fact, the ALJ need not even explicitly discuss each factor. *Collins v. Berryhill*, 743 F. App'x 21, 25 (7th Cir. 2018).

### 4.2.1. State Agency Medical Consultants

Baumblatt concluded that Wolvin would "be capable of light exertional work with frequent climbing of ramps and stairs, balancing, kneeling, crouching and crawling and occasional climbing of ladders, ropes and scaffolds and stooping." (Tr. 1704.) The ALJ gave this opinion only "partial weight" because subsequent evidence, "particularly the evidence from Dr. Hogendorn documenting ongoing treatment and the claimant's subsequent hearing testimony, demands the further restriction to sedentary work assigned in the residual functional capacity finding." (Tr. 1704.) The ALJ rejected Baumblatt's postural limitations because Wolvin "has presented as fairly agile with good strength and good to only mildly reduced range of motion at times." (Tr. 1704.)

Chan concluded that Wolvin was capable of light work. (Tr. 1704.) The ALJ discounted this opinion because, like Baumblatt's opinion, it did not consider subsequent evidence. (Tr. 1704.)

Wolvin's substantive argument regarding these opinions is that the opinion of a non-examining source is an insufficient basis, by itself, for an ALJ to reject the opinion of a treating source. (ECF No. 24 at 21.) Wolvin goes so far as to argue, "The Seventh Circuit

has held that substantial evidence does not support an ALJ's decision to give greater weight to nonexamining state agency physicians who have not reviewed medical records relevant to determining a claimant's functional limitations." (ECF No. 24 at 20.) However, none of the cases Wolvin cites actually supports this assertion. And that is not surprising. Wolvin's argument amounts to a contention that an ALJ must always credit the opinion of an examining source over that of a non-examining source. But that is not the law. Rather, what the cases Wolvin cites actually say is that an ALJ errs if he "uncritically" accepts the opinion of a nonexamining source over the opinion of a treating source. *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016). The ALJ here critically reviewed the opinions of the non-examining sources and, significantly, did not wholly accept them. Wolvin has not demonstrated that the ALJ erred in his assessment of these opinions.

### 4.2.2. Medical Expert

The ALJ also gave little weight to Lorber's opinion, who testified at the hearing as a medical expert. The ALJ stated,

> Lorber testified that the claimant could perform sedentary work except he could not work at unprotected heights or around dangerous moving machinery, had to avoid exposure to concentrated vibration, could not climb ladders, ropes or scaffolds, kneel or crawl, could occasionally balance, stoop, crouch, and operate foot controls. Dr. Lorber further stated the claimant's ability to stand and/or walk was limited to intervals of thirty minutes not to exceed a total of two hours per day. He provided that the claimant could sit for no more than four hours per day and one hour at a time. He stated the claimant could not work a full eight-hour day.

(Tr. 1708.)

The ALJ noted that Lorder reached his opinions without having had a sufficient opportunity to review the record. (Tr. 1708.) The limitations identified by Lorber, particularly the exertional limitations, "were not consistent with the evidence of record." (Tr. 1708.) The ALJ explained,

> the residual functional capacity restriction to sedentary work adequately addresses any limitations associated with the claimant's lumbar spine disorder given the objective findings of a normal gait, an ability to walk on heels and toes and do deep knee bends, good upper and lower extremity and grip strength, negative straight leg raise testing, normal bulk and tone, intact coordination and balance, and the absence of acute distress and agility in rising from the examination floor (Ex. 9F, 11F, 14F, 20F, 27F). Further, as noted above, the limitation to sedentary work accommodates any need on the part of the claimant to change positions and any postural restrictions (SSR 96-9p).

(Tr. 1708.)

Notwithstanding Wolvin's contention that Lorber was sufficiently prepared, Lorber acknowledged that his review was "not up to my usual standard," having been notified of the hearing only that morning. (Tr. 1727; *see also* 1722 (noting that the hearing began at 1:39 PM).) Although Lorber was very experienced, having testified "several thousand" times over 40 years, the record here is quite large, and it is reasonable to expect that even an experienced examiner may need more than a few hours to review it and form a well-supported opinion. There was no error in the ALJ characterizing Lorber as "not hav[ing] sufficient opportunity to review the claimant's file prior to rendering his opinions," and relying on that as one factor in the weight he gave Lorber's opinions. (Tr. 1708.)

Case 2:21-cv-01328-WED   Filed 01/24/23   Page 15 of 27   Document 38

The ALJ also reasonably characterized Lorber's testimony as reflecting a lack of awareness of the claimant's activities and agility. (Tr. 1708.) For example, Lorber acknowledged that the record included instances of Wolvin engaging in activities that were inconsistent with the limitations Lorber identified and that the intensity and persistence of his symptoms "would be an area of concern that would have to be explored." (Tr. 1737-38.)

Wolvin also argues:

> The ALJ called for the services of a medical expert in order to aid him in better understanding the nature of Wolvin's physical impairments and the manner in which they might be expected to limit his function. However, by rejecting the testimony of the testifying medical expert, it means that he was left with the same self-identified deficit that required scheduling a medical expert in the first place.

(ECF No. 24 at 28.)

An ALJ may call upon a medical expert for multiple purposes, including clarifying the medical evidence or assessing the claimant's RFC. *Gebauer v. Saul*, 801 F. App'x 404, 408 (7th Cir. 2020) (citing HALLEX I-2-5-34(A)(2) (2016)). When an ALJ obtains a medical expert's opinion as to the claimant's RFC, it is just another medical opinion that the ALJ must assess in accordance with the applicable regulations. If the ALJ were required to accept a medical expert's RFC opinion, the medical expert would supplant the ALJ's role in determining disability. But an ALJ by calling for the services of a medical expert does not delegate to the expert the responsibility for determining disability. The ALJ was not required to accept Lorber's opinion. Instead, he was required to assess its consistency

with the record as a whole. Lorber emphasized the objective evidence—the CAT scan and MRI—to conclude that Wolvin was at "a limited range … of sedentary activities." (Tr. 1734-35; *see also* 1736-37.) The ALJ found that other evidence—specifically, the subjective evidence that Lorber did not fully explore—warranted discounting Lorber's opinion. Such assessments are within the purview of the ALJ, and Wolvin has not shown that the ALJ's assessment was unsupported by substantial evidence or otherwise constituted an error of law.

### 4.2.3. Freeman

Freeman never treated or examined Wolvin but only reviewed his records at Wolvin's request. In 2014 he opined that, as of 2005, Wolvin was not able to perform the full range of sedentary work. (Tr. 1185-88; 1200-03; 1707.) As the ALJ characterized his opinion,

> [h]e stated that the claimant could walk and stand about one hour per day in brief five to ten minutes periods of duration on a regular basis with rare ability to exceed that total daily time duration and to walk up to a few blocks at a very reduced pace. He opined the claimant could lift, carry, push, and pull no weight frequently or occasionally and five pounds rarely and ten pounds extremely rarely. He limited the claimant to rare postural changes, no exposure to high levels of vibration, no activities at unprotected heights or with dangerous equipment and machinery. He stated the claimant would experience interruption of activities of any type, in any body position, approximately several times an hour on average, and would experience approximately weekly episodes of marked deterioration in function lasting eight to twenty-four hours with increased limitations during these episodes.

(Tr. 1707-08.)

The ALJ gave Freeman's opinion little weight because it came a year after Wolvin's established onset date and thus was based on evidence not wholly relevant to the issue presented. The ALJ characterized Freeman's opinion as "extreme" and found that it was "without support in the record." The ALJ noted that

> Freeman's exertional, postural and environmental limitations are inconsistent with the claimant's relatively good function across examinations (e.g., normal gait, an ability to walk on heels and toes and do deep knee bends, good upper and lower extremity and grip strength, negative straight leg raise testing, normal bulk and tone, intact coordination and balance (Ex. 9F, 11F, 14F, 20F, 27F) and the claimant's reports of debilitating pain that are out of proportion to the clinical observations that the claimant was in no acute distress (Ex. 9F, 11F, 14F, 20F, 27F).

(Tr. 1708.)

Wolvin notes that medical opinions routinely come long after the period discussed, as did Chan's and Lorber's. Yet the ALJ did not discount Chan's or Lorber's opinions on the basis of timeliness. (ECF No. 24 at 27.) Wolvin also argues that Freeman's opinion was not extreme but rather was consistent with Lorber's opinion. (ECF No. 24 at 27.)

Wolvin's arguments again establish, at best, that the ALJ could have afforded more weight to Freeman's opinion. The ALJ simply found other evidence more persuasive. Wolvin has not shown that the ALJ was required to afford greater weight to Freeman's opinion or that the ALJ otherwise erred.

### 4.2.4. Kahle and Trier

Kahle treated Wolvin "on several occasions in 2004 and 2005" and opined in May 2006 that he would need a "nonphysically demanding job," which he stated would mean no "repetitive bending, lifting and twisting," lifting no more than 20 pounds, and "he should probably be able to change positions from sitting to standing and walking periodically during the day to maintain a comfort level." (Tr. 195.)

Trier saw Wolvin once in December of 2005 for a second opinion, and in January 2007 offered an opinion largely identical to Kahle, although he did not suggest that Wolvin may need to be able to switch positions. (Tr. 234.)

The ALJ gave Kahle's and Trier's opinions "partial weight," and concluded that a limitation to a "nonphysically demanding job" was accommodated in sedentary work. (Tr. 1705-06.) He further stated that the limitations regarding twisting and bending "do not typically erode the occupational base for sedentary, unskilled work (see SSR 96-9p) and the claimant has presented as fairly agile with good strength and good to only mildly reduced range of motion at times (Ex. 11F, 14F)." (Tr. 1705.)

Wolvin argues that the ALJ erred by not addressing Trier's and Kahle's opinions in light of the regulatory factors, *see* 20 C.F.R. §§ 404.1527, 416.927, and that he should have consulted a vocational expert about whether the non-exertional limitations could be accommodated in sedentary work. (ECF No. 24 at 23.)

The ALJ correctly noted that postural limitations "would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." SSR 96-9p. Thus, that aspect of Trier's and Kahle's opinions was accommodated in the ALJ's RFC finding. Wolvin has not demonstrated that the ALJ erred by not consulting a vocational expert regarding these limitations.

The only portion of these opinions that was not reflected in the ALJ's RFC finding is Kahle's speculation that Wolvin "should probably be able to change positions from sitting to standing and walking periodically during the day to maintain a comfort level." (Tr. 195.) The ALJ concluded that Wolvin's "need for position change can be accommodated by the breaks and lunch period given the good clinical examination findings and instances of pain complaints out of proportion to provider observations cited in the prior paragraphs." (Tr. 1705.) In other words, the ALJ concluded that, insofar as Kahle suggested that Wolvin needed to change positions more than during regular breaks, the record did not support that limitation.

Consistent with the regulatory factors, the ALJ acknowledged Kahle's limited treating relationship (Tr. 1698, 1699) and specialization as an orthopedic surgeon (Tr. 1698, 1699, 1704), and concluded that, insofar as Kahle found that Wolvin would need to alternate between sitting, standing, and walking more than was accommodated by regular breaks, that opinion was not consistent with nor supported by the record. This

discussion was sufficient to satisfy the ALJ's obligation to minimally articulate his reasoning for the weight he gave Kahle's opinion.

As such, the ALJ did not err in his assessment of Kahle's and Trier's opinions.

### 4.2.5. Hogendorn

Hogendorn had the most significant treating relationship with Wolvin and offered the most substantive opinions. In the first, dated May 1, 2009, Hogendorn found Wolvin capable of sedentary work but with significant additional limitations—"one hour of standing, one to two hours of walking, three to four hours of sitting and driving total in a day," "he could never bend, squat or climb and only occasionally reach above shoulder level," and he would be initially limited to working four hours per day but he may be able to increase this over time. (Tr. 1706.) But she stated that these limitations would be temporary—lasting only six to twelve months. (Tr. 1706.)

The ALJ gave this opinion partial weight. (Tr. 1706.) Insofar as the opinion indicated that Wolvin was incapable of the full range of sedentary work, the ALJ noted that Hogendorn expressly stated that her opinion was temporary and therefore could not be applied to the whole period. (Tr. 1706.) He also found the opinion inconsistent with the medical evidence, including Hogendorn's own notes. (Tr. 1706.)

In October 2009 Hogendorn stated that Wolvin's symptoms would frequently interfere with his attention and concentration. (Tr. 1706.) He could walk a block without pain but "could only sit for ten minutes and stand/walk for fifteen to twenty minutes at

Case 2:21-cv-01328-WED   Filed 01/24/23   Page 21 of 27   Document 38

a time" and "sit and stand/walk for less than two hours." (Tr. 1706.) He would be required to walk for five minutes every fifteen minutes and would need to be able to switch positions at will. (Tr. 1707.) He "could occasionally lift less than ten pounds and rarely lift ten pounds," "could never twist, stoop, crouch/squat, and climb ladders and rarely climb stairs," and "would be absent more than four days per month." (Tr. 1707.) "She stated her limitations stretched back to the 1980s." (Tr. 1707.)

The ALJ gave this opinion little weight. (Tr. 1706.) Hogendorn's opinion that these limitations dated to the 1980s was speculative in that she did not treat Wolvin at that time and did not review any medical records from that period. (Tr. 1707.) Moreover, that opinion is obviously inconsistent with the record; Wolvin was working at the medium exertional level at that time and for many years after. (Tr. 1707.) The ALJ also found the opinion inconsistent with the medical evidence, including Hogendorn's own observations, and not otherwise supported by the evidence. (Tr. 1707.)

In September 2014 Hogendorn said that Wolvin's pain would occasionally interfere with his concentration and attention. (Tr. 1707.) Wolvin "could walk for one to two blocks," "sit and stand for fifteen minutes at a time," "sit and stand/walk each for less than two hours total in a day," "would need to get up and walk every fifteen to thirty minutes for five minutes" "would need a job that permitted him to shift positions at will," "would require unscheduled breaks," "could occasionally lift less than ten pounds and rarely ten to twenty pounds," and "could frequently engage in postural activities related

to his neck, rarely twist and climb stairs, and never stoop, crouch and climb ladders." (Tr. 1707.) "She stated that the limitations had been in place since September 2007." (Tr. 1707.)

The ALJ gave this opinion little weight. He noted that "she issued this assessment long after the claimant's established onset date and the period at issue in this decision." Therefore, "[h]er opinion would have been informed, at least in part, by evidence considered after that date." (Tr. 1707.) Additionally, much the same as the October 2009 opinion, the limitations were not compatible with her and others' examinations. (Tr. 1707.)

Wolvin's challenge to the ALJ's assessment of Hogendorn's opinions begins with a mischaracterization of the ALJ's decision. Wolvin asserts that the ALJ erred because he found Hogendorn's first opinion consistent with sedentary work. (ECF No. 24 at 24.) What the ALJ actually said was that he accepted Hogendorn's opinion only insofar as they allowed for sedentary work. (Tr. 1706.)

Wolvin next again notes that, while the ALJ emphasized certain normal findings, there were also many abnormal objective findings and other evidence that tends to support Wolvin's professed limitations. (ECF No. 24 at 24-26.) But throughout his decision the ALJ complied with his obligation to confront contrary evidence and explain why it was rejected. *See Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018). Thus, his ultimate reliance on normal findings did not rise to the level of impermissible cherry-picking. *See Mazza v. Saul*, No. 19-CV-1724, 2020 U.S. Dist. LEXIS 219689, at *18 (E.D. Wis.

Nov. 24, 2020) (discussing what constitutes "cherry-picking"). In fact, significant abnormalities would be expected given the ALJ's decision to limit Wolvin to sedentary work. That the ALJ found certain evidence more persuasive than other evidence is not error.

With respect to Hogendorn's October 2009 opinion Wolvin argues that "it is unclear what discrepancies were observed related to pain behaviors." (ECF No. 24 at 25.) However, reading the ALJ's decision in whole, it is clear that the ALJ was referring to facts such as Wolvin's professed extreme pain and need to lay on the floor juxtaposed with the contemporaneous observations that he did not appear to be in any acute distress and his ability to easily get up from the floor.

Overall, Wolvin argues that "the rationale utilized by the ALJ is poor" and "he fails to address his opinion in the context of the 20 C.F.R. § 404.1527(c) factors …." (ECF No. 24 at 26.) However, the ALJ acknowledged Hogendorn's specialization as a "physical medicine and rehabilitation provider" and that she had been treating Wolvin since 2007. (Tr. 1700.) But as the ALJ's discussion makes clear, he found that other factors—supportability and consistency—merited discounting her opinions.

The ALJ's discussion complied with his obligation to consider the regulatory factors and to minimally articulate his reasoning. Overall, he complied with his obligation to "offer good reasons for discounting the opinion of a treating physician."

*Israel*, 840 F.3d at 437. The ALJ did not error in his assessment of Hogendorn's opinion and his conclusion is supported by substantial evidence.

## 5. Conclusion

The voluminous record readily establishes that Wolvin is significantly impaired. This evidence includes, as the ALJ noted, objective imaging that identified multi-level degenerative disc disease (Tr. 1698), abnormalities in physical examinations, including "tenderness to palpation, decreased range of motion, positive straight leg raise testing, abnormal modified Schober testing, absent to diminished lower extremity reflexes and a slow, deliberate or antalgic/ataxic gait" (Tr. 1698), extensive treatment efforts, including "multiple courses of physical therapy, aqua therapy, TENS unit, ice/heat, exercises and stretches, chiropractic care, epidural steroid injections in October and November 2006, and pain medication that included extensive narcotic medications and muscle relaxers" that provided, at best, only limited and temporary relief (Tr. 1698), significant limitations in his daily activities (Tr. 1697), and reports of constant severe pain (Tr. 1700). Nearly all of Wolvin's treating physicians, as well as a consultative physician who examined his medical record and the medical expert called by the ALJ, concluded that Wolvin had limitations that precluded him from being able to work.

That the record is replete with evidence supporting Wolvin's impairments and limitations is hardly surprising. After all, the Commissioner found that Wolvin was

capable of only sedentary work (Tr. 1696), and therefore he was disabled once he turned 50 years old (Tr. 508-28).

But the ALJ ultimately concluded that Wolvin's impairments were not so limiting as to preclude him from all work during the relevant period. He found other evidence more persuasive, including physical examinations that "typically show the claimant to be in no distress with normal gait, strength, sensation, coordination and balance, normal bulk and tone, negative straight leg raise testing and intact ability to walk on heels and toes and do deep knee bends" (Tr. 1699), medical providers having frequently noted that he did not appear to be in any acute distress even though he was reporting severe pain, and the fact that he was able to easily get up from the floor despite reportedly needing to lie down because of extreme pain.

Wolvin's arguments largely amount to assertions that the ALJ should have given more weight to certain opinions and credited certain evidence over other evidence. But a court cannot set aside a final decision of the Commissioner based on mere disagreements as to the weight of the evidence. An ALJ does not err merely because reasonable minds may disagree as to whether the claimant is disabled. *L.D.R.*, 920 F.3d at 1152. "Faced with evidence that cuts both ways, the fact that the ALJ chose one side does not suggest error." *Green*, 2021 U.S. Dist. LEXIS 142304, at *10. In fact, as the court noted the last time Wolvin's case was before it, "Two contrary conclusions may each be supported by substantial evidence." *Wolvin*, 2019 U.S. Dist. LEXIS 171953, at *5-6.

Nor must an ALJ discuss all the evidence. An ALJ can always say more; the court's concern is only if he said enough. Provided the ALJ complied with the law and his conclusion is supported by the comparatively low quantum of "substantial evidence," a court cannot set his decision aside. *See Biestek*, 139 S. Ct. at 1154.

None of Wolvin's arguments support setting aside the ALJ's decision. Therefore, the court is required to affirm the final decision of the Commissioner.

**IT IS THEREFORE ORDERED** that the decision of the Commissioner is **affirmed**. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 24th day of January, 2023.

WILLIAM E. DUFFIN
U.S. Magistrate Judge